## YOUNGSTOWN SHEET & TUBE CO. v. SAWYER.

Supreme Court of The United States.

Nos. 744, 745.  Decided June 2, 1952.

For Majority Opinion see 62 Abs 417.
### DISSENTING OPINION
MR. CHIEF JUSTICE VINSON, with whom MR. JUSTICE REED and MR. JUSTICE MINTON join, dissenting.

The President of the United States directed the Secretary of Commerce to take temporary possession of the Nation's steel mills during the existing emergency because "a work stoppage would immediately jeopardize and imperil our national defense and the defense of those joined with us in resisting aggression, and would add to the continuing danger of our soldiers, sailors and airmen engaged in combat in the field." The District Court ordered the mills returned to their private owners on the ground that the President's action was beyond his powers under the Constitution.

This Court affirms. Some members of the Court are of the view that the President is without power to act in time of crisis in the absence of express statutory authorization. Other members of the Court affirm on the basis of their reading of certain statutes. Because we cannot agree that affirmance

is proper on any ground, and because of the transcending importance of the questions presented not only in this critical litigation but also to the powers the President and of future Presidents to act in time of crisis, we are compelled to register this dissent.

I.

In passing upon the question of Presidential powers in this case, we must first consider the context in which those powers were exercised.

Those who suggest that this is a case involving extraordinary powers should be mindful that these are extraordinary times. A world not yet recovered from the devastation of World War II has been forced to face the threat of another and more terrifying global conflict.

Accepting in full measure its responsibility in the world community, the United States was instrumental in securing adoption of the United Nations Charter, approved by the Senate by a vote of 89 to 2. The first purpose of the United Nations is to "maintain international peace and security, and to that end: to take effective collective measures for the prevention and removal of threats to the peace, and for the suppression of acts of aggression or other breaches of the peace, * * *"[1] In 1950, when the United Nations called upon member nations "to render every assistance" to repel aggression in Korea, the United States furnished its vigorous support.[2] For almost two full years, our armed forces have been fighting in Korea, suffering casualties of over 108,000 men. Hostilities have not abated. The "determination of the United Nations to continue its action in Korea to meet the aggression" has been reaffirmed.[3] Congressional support of the action in Korea has been manifested by provisions for increased military manpower and equipment and for economic stablization, as hereinafter described.

Further efforts to protect the free world from aggression are found in the congressional enactments of the Truman Plan for assistance to Greece and Turkey[4] and the Marshall Plan for economic aid needed to build up the strength of our friends in Western Europe.[5] In 1949, the Senate approved the North

1. 59 Stat. 1031, 1037 (1945); 91 Cong. Rec. 8190 (1945).

2. U. N. Security Council, U. N. Doc. S/1501 (1950); Statement by the President, June 25, 1950, United States Policy in the Korean Crisis, Dept. of State Pub. (1950), 16.

3. U. N. General Assembly, U. N. Doc. A/1771 (1951).

4. 61 Stat. 103 (1947).

5. 62 Stat. 137 (1948), as amended, 63 Stat. 50 (1949), 64 Stat. 198 (1950).

Atlantic Treaty under which each member nation agrees that an armed attack against one is an armed attack against all.[6] Congress immediately implemented the North Atlantic Treaty by authorizing military assistance to nations dedicated to the principles of mutual security under the United Nations Charter.[7] The concept of mutual security recently has been extended by treaty to friends in the Pacific.[8]

Our treaties represent not merely legal obligations but show congressional recognition that mutual security for the free world is the best security against the threat of aggression on a global scale. . The need for mutual security is shown by the very size of the armed forces outside the free world. Defendant's brief informs us that the Soviet Union maintains the largest air force in the world and maintains ground forces much larger than those presently available to the United States and the countries joined with us in mutual security arrangements. Constant international tensions are cited to demonstrate how precarious is the peace.

Even this brief review of our responsibilities in the world community discloses the enormity of our undertaking. Success of these measures may, as has often been observed, dramatically influence the lives of many generations of the world's peoples yet unborn. Alert to our responsibilities, which coincide with our own self preservation through mutual security, Congress has enacted a large body of implementing legislation. As an illustration of the magnitude of the over-all program, Congress has appropriated $130 billion for our own defense and for military assistance to our allies since the June, 1950, attack in Korea.

In the Mutual Security Act of 1951, Congress authorized "military, economic, and technical assistance to friendly countries to strengthen the mutual security and individual and collective defenses of the free world, * * *."[9] Over $5½ billion were appropriated for military assistance for fiscal year 1952, the bulk of that amount to be devoted to purchase of military equipment.[10] A request for over $7 billion for the same pur-

6. 63 Stat. 2241 (1949), extended to Greece and Turkey, S. Exec. E., 82d Cong., 2d Sess. (1952), advice and consent of the Senate granted. Cong. Rec., Feb. 7, 1952, p. 944.

7. 63 Stat. 714 (1949).

8. S. Execs. A, B. C and D, 82d Cong., 2d Sess. (1952), advice and consent of the Senate granted. Cong. Rec., Mar. 20, 1952, pp. 2635. 2636, 2646.

9. 65 Stat. 373 (1951).

10. 65 Stat. 730 (1951); see H. R. Doc. No. 147, 82d Cong., 1st Sess. 3 (1951).

pose for fiscal year 1953 is currently pending in Congress.[11] In addition to direct shipment of military equipment to nations of the free world, defense production in those countries relies upon shipment of machine tools and allocation of steel tonnage from the United States.[12]

Congress also directed the President to build up our own defense. Congress, recognizing the "grim fact * * * that the United States is now engaged in a struggle for survival" and that "it is imperative that we now take those necessary steps to make our strength equal to the peril of the hour," granted authority to draft men into the armed forces.[13] As a result, we now have over 3,500,000 men in our armed forces.[14]

Appropriations for the Department of Defense, which had averaged less than $13 billion per year for the three years before the attack in Korea, were increased by Congress to $48 billion for fiscal year 1951 and to $60 billion for fiscal year 1952.[15] A request for $51 billion for the Department of Defense for fiscal year 1953 is currently pending in Congress.[16] The bulk of the increase is for military equipment and supplies—guns, tanks, ships, planes and ammunition—all of which require steel. Other defense programs requiring great quantities of steel include the large scale expansion of facilities for the Atomic Energy Commission[17] and the expansion of the Nation's productive capacity affirmatively encouraged by Congress.[18]

Congress recognized the impact of these defense programs upon the economy. Following the attack in Korea, the Presi-

11. See H. R. Doc. 382, 82d Cong., 2d Sess. (1952).

12. Hearings before Senate Committee on Foreign Relations on the Mutual Security Act of 1952, 82d Cong., 2d Sess. 565-566 (1952); Hearings before House Committee on Foreign Affairs on the Mutual Security Act of 1952, 82d Cong., 2d Sess. 370 (1952).

13. 65 Stat. 75 (1951); S. Rep. No. 117, 82d Cong., 1st Sess. 3 (1951).

14. Address by Secretary of Defense Lovett Before the American Society of Newspaper Editors, Washington, April 18, 1952.

15. Fiscal Year 1952, 65 Stat. 423, 760 (1951); F. Y. 1951, 64 Stat. 595, 1044, 1223, 65 Stat. 48 (1950-1951); F. Y. 1950, 63 Stat. 869, 973, 987 (1949); F. Y. 1949, 62 Stat. 647 (1948); F. Y. 1948, 61 Stat. 551 (1947).

16. See H. R. Rep. No. 1685, 82d Cong., 2d Sess. 2 (1952). on H. R. 7391.

17. See H. R. Rep. No. 384, 82d Cong., 1st Sess. 5 (1951); Cong. Rec., Oct. 19, 1951, pp. 13842-13844.

18. Defense Production Act. Tit. III. 64 Stat. 798 (1950), 65 Stat. 138 (1951).

dent asked for authority to requisition property and to allocate and fix priorities for scarce goods. In the Defense Production Act of 1950, Congress granted the powers requested and, in addition, granted power to stabilize prices and wages and to provide for settlement of labor disputes arising in the defense program.[19] The Defense Production Act was extended in 1951, a Senate Committee noting that in the dislocation caused by programs for purchase of military equipment "lies the seed of an economic disaster that might well destroy the military might we are straining to build."[20] Significantly, the Committee examined the problem "in terms of just one commodity, steel," and found "a graphic picture of the over-all inflationary danger growing out of reduced civilian supplies and rising incomes." Even before Korea, steel production at levels above theoretical 100% capacity was not capable of supplying civilian needs alone. Since Korea, the tremendous military demand for steel has far exceeded the increases in productive capacity. This Committee emphasized that the shortage of steel, even with the mills operating at full capacity, coupled with increased civilian purchasing power, presented grave danger of disastrous inflation."[21]

The President has the duty to execute the foregoing legislative programs. Their successful execution depends upon continued production of steel and stabilized prices for steel. Accordingly, when the collective bargaining agreements between the Nation's steel producers and their employees, represented by the United Steel Workers, were due to expire on December 31, 1951, and a strike shutting down the entire basic steel industry was threatened, the President acted to avert a complete shutdown of steel production. On December 22, 1951, he certified the dispute to the Wage Stabilization Board, requesting that the Board investigate the dispute and promptly report its recommendation as to fair and equitable terms of settlement. The Union complied with the President's request and delayed its threatened strike while the dispute was before the Board. After a special Board panel had conducted hearings and submitted a report, the full Wage Stabilization Board submitted its report and recommendations to the President on March 20, 1952.

The Board's report was acceptable to the Union but was rejected by plaintiffs. The Union gave notice of its intent to strike as of 12:01 a. m., April 9, 1952, but bargaining between the parties continued with hope of settlement until the even-

---

19. Note 18, supra, Tits. IV and V.

20. S. Rep. No. 470, 82d Cong., 1st Sess. 8 (1951).

21. Id., at 8-9.

ing of April 8, 1952. After bargaining had failed to aver the threatened shutdown of steel production, the President issued the following Executive Order:

"WHEREAS on December 16, 1950, I proclaimed the existence of a national emergency which requires that the military, naval, air, and civilian defenses of this country be strengthened as speedily as possible to the end that we may be able to repel any and all threats against our national security and to fulfill our responsibilities in the efforts being made throughout the United Nations and otherwise to bring about a lasting peace; and

"WHEREAS American fighting men and fighting men of other nations of the United Nations are now engaged in deadly combat with the forces of aggression in Korea, and forces of the United States are stationed elsewhere overseas for the purpose of participating in the defense of the Atlantic Community against aggression; and

"WHEREAS the weapons and other materials needed by our armed forces and by those joined with us in the defense of the free world are produced to a great extent in this country, and steel is an indispensable component of substantially all of such weapons and materials; and

"WHEREAS steel is likewise indispensable to the carrying out of programs of the Atomic Energy Commission of vital importance to our defense efforts; and

"WHEREAS a continuing and uninterrupted supply of steel is also indispensable to the maintenance of the economy of the United States, upon which our military strength depends; and

"WHEREAS a controversy has arisen between certain companies in the United States producing and fabricating steel and the elements thereof and certain of their workers represented by the United Steelworkers of America, CIO, regarding terms and conditions of employment; and

"WHEREAS the controversy has not been settled through the processes of collective bargaining or through the efforts of the Government, including those of the Wage Stabilization Board, to which the controversy was referred on December 22, 1951, pursuant to Executive Order No. 10233, and a strike has been called for 12:01 A. M., April 9, 1952; and

"WHEREAS a work stoppage would immediately jeopardize and imperil our national defense and the defense of those joined with us in resisting aggression, and would add to the continuing danger of our soldiers, sailors, and airmen engaged in combat in the field; and

"WHEREAS in order to assure the continued availability of steel and steel products during the existing emergency, it is

necessary that the United States take possession of and oper-
ate the plants, facilities, and other property of the said com-
panies as hereinafter provided:

"NOW, THEREFORE, by virtue of the authority vested in
me by the Constitution and laws of the United States, and
as President of the United States and Commander in Chief
of the armed forces of the United States, it is hereby ordered
as follows:

"1. The Secretary of Commerce is hereby authorized and
directed to take possession of all or such of the plants' facili-
ties, and other property of the companies named in the list
attached hereto, or any part thereof, as he may deem neces-
sary in the interests of national defense; and to operate or
to arrange for the operation thereof and to do all things neces-
sary for, or incidental to, such operation * * *."[22]

The next morning, April 9, 1952, the President addressed
the following Message to Congress:

**"To the Congress of the United States:**

The Congress is undoubtedly aware of the recent events
which have taken place in connection with the management-
labor dispute in the steel industry. These events culminated
in the action which was taken last night to provide for
temporary operation of the steel mills by the Government.

"I took this action with the utmost reluctance. The idea
of Government operation of the steel mills is thoroughly dis-
tasteful to me and I want to see it ended as soon as possible.
However, in the situation which confronted me yesterday, I
felt that I could make no other choice. The other alternatives
appeared to be even worse—so much worse that I could not
accept them.

"One alternative would have been to permit a shutdown
in the steel industry. The effects of such a shut-down would
have been so immediate and damaging with respect to our
efforts to support our Armed Forces and to protect our na-
tional security that it made this alternative unthinkable.

"The only way that I know of, other than Government
operation, by which a steel shut-down could have been avoided
was to grant the demands of the steel industry for a large
price increase. I believed and the officials in charge of our
stabilization agencies believed that this would have wrecked
our stabilization program. I was unwilling to accept the
incalculable damage which might be done to our country
by following such a course.

"Accordingly, it was my judgment that Government opera-
tion of the steel mills for a temporary period was the least

22. Exec. Order 10340, 17 Fed. Reg. 3139 (1952).

undesirable of the courses of action which lay open. In the circumstances, I believed it to be, and now believe it to be, my duty and within my powers as President to follow that course of action.

"It may be that Congress will deem some other course to be wiser. It may be that the Congress will feel we should give in to the demands of the steel industry for an exorbitant price increase and take the consequences so far as resulting inflation is concerned.

"It may be that the Congress will feel the Government should try to force the steel workers to continue to work for the steel companies for another long period, without a contract, even though the steel workers have already voluntarily remained at work without a contract for 100 days in an effort to reach an orderly settlement of their differences with management.

"It may even be that the Congress will feel that we should permit a shut-down of the steel industry, although that would immediately endanger the safety of our fighting forces abroad and weaken the whole structure of our national security.

"I do not believe the Congress will favor any of these courses of action, but that is a matter for the Congress to determine.

"It may be, on the other hand, that the Congress will wish to pass legislation establishing specific terms and conditions with reference to the operation of the steel mills by the Government. Sound legislation of this character might be very desirable.

"On the basis of the facts that are known to me at this time, I do not believe that immediate congressional action is essential; but I would, of course, be glad to cooperate in developing any legislative proposals which the Congress may wish to consider.

"If the Congress does not deem it necessary to act at this time, I shall continue to do all that is within my power to keep the steel industry operating and at the same time make every effort to bring about a settlement of the dispute so the mills can be returned to their private owners as soon as possible."[23]

Twelve days passed without action by Congress. On April 21, 1952, the President sent a letter to the President of the Senate in which he again described the purpose and need for his action and again stated his position that "The Congress can, if it wishes, reject the course of action I have followed in this matter."[24] Congress has not so acted to this date.

23. Cong. Rec., April 9, 1952, pp. 3962-3963.
24. Cong. Rec., April 21, 1952, p. 4192.

Meanwhile, plaintiffs instituted this action in the District Court to compel defendant to return possession of the steel mills seized under Executive Order 10340. In this litigation for return of plaintiffs' properties, we assume that defendant Charles Sawyer is not immune from judicial restraint and that plaintiffs are entitled to equitable relief if we find that the Executive Order under which defendant acts is unconstitutional. We also assume without deciding that the courts may go behind a President's finding of fact that an emergency exists. But there is not the slightest basis for suggesting that the President's finding in this case can be undermined. Plaintiffs moved for a preliminary injunction before answer or hearing. Defendant opposed the motion, filing uncontroverted affidavits at Government officials describing the facts underlying the President's order.

Secretary of Defense Lovett swore that "a work stoppage in the steel industry will result immediately in serious curtailment of production of essential weapons and munitions of all kinds." He illustrated by showing that 84% of the national production of certain alloy steel is currently used for production of military-end items and that 35% of total production of another form of steel goes into ammunition, 80% of such ammunition now going to Korea. The Secretary of Defense stated that: "We are holding the line [in Korea] with ammunition and not with the lives of our troops."

Affidavits of the Chairman of the Atomic Energy Commission, the Secretary of the Interior, defendant as Secretary of Commerce, and the Administrators of the Defense Production Administration, the National Production Authority, the General Services Administration and the Defense Transport Administration were also filed in the District Court. These affidavits disclose an enormous demand for steel in such vital defense programs as the expansion of facilities in atomic energy, petroleum, power, transportation and industrial production, including steel production. Those charged with administering allocations and priorities swore to the vital part steel production plays in our economy. The affidavits emphasize the critical need for steel in our defense program, the absence of appreciable inventories of steel, and the drastic results of any interruption in steel production.

One is not here called upon even to consider the possibility of executive seizure of a farm, a corner grocery store or even a single industrial plant. Such considerations arise only when one ignores the central fact of this case—that the Nation's

entire basic steel production would have shut down completely if there had been no Government seizure. Even ignoring for the moment whatever confidential information the President may possess as "the Nation's organ for foreign affairs,"[25] the uncontroverted affidavits in this record amply support the finding that "a work stoppage would immediately jeopardize and imperil our national defense."

Plaintiffs do not remotely suggest any basis for rejecting the President's finding that any stoppage of steel production would immediately place the Nation in peril. Moreover, even self-generated doubts that any stoppage of steel production constitutes an emergency are of little comfort here. The Union and the plaintiffs bargained for 6 months with over 100 issues in dispute—issues not limited to wage demands but including the union shop and other matters of principle between the parties. At the time of seizure there was not, and there is not now, the slightest evidence to justify the belief that any strike will be of short duration. The Union and the steel companies may well engage in a lengthy struggle. Plaintiff's counsel tells us that "sooner or later" the mills will operate again. That may satisfy the steel companies and, perhaps, the Union. But our soldiers and our allies will hardly be cheered with the assurance that the ammunition upon which their lives depend will be forthcoming—"sooner or later," or, in other words, "too little and too late."

Accordingly, if the President has any power under the Constitution to meet a critical situation in the absence of express statutory authorization, there is no basis whatever for criticizing the exercise of such power in this case.

## II.

The steel mills were seized for a public use. The power of eminent domain, invoked in this case, is an essential attribute of sovereignty and has long been recognized as a power of the Federal Government. Kohl v. United States, 91 U. S. 367 (1876). Plaintiffs cannot complain that any provision in the Constitution prohibits the exercise of the power of eminent domain in this case. The Fifth Amendment provides: "nor shall private property be taken for public use, without just compensation." It is no bar to this seizure for, if the taking is not otherwise unlawful, plaintiffs are assured of receiving the required just compensation. United States v. Pewee Coal Co., 341 U. S. 114 (1951).

---

25. Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U. S. 103, 111 (1948), and cases cited.

Admitting that the Government could seize the mills, plaintiffs claim that the implied power of eminent domain can be exercised only under an Act of Congress; under no circumstances, they say, can that power be exercised by the President unless he can point to an express provision in enabling legislation. This was the view adopted by the District Judge when he granted the preliminary injunction. Without an answer, without hearing evidence, he determined the issue on the basis of his "fixed conclusion * * * that defendant's acts are illegal" because the President's only course in the face of an emergency is to present the matter to Congress and await the final passage of legislation which will enable the Government to cope with threatened disaster.

Under this view, the President is left powerless at the very moment when the need for action may be most pressing and when no one, other than he, is immediately capable of action. Under this view, he is left powerless because a power not expressly given to Congress is nevertheless found to rest exclusively with Congress.

Consideration of this view of executive impotence calls for further examination of the nature of the separation of powers under our tripartite system of Government.

The Constitution provides.

Art. I,

Section 1. "All legislative Powers herein granted shall be vested in a Congress of the United States, * * *.

Art. II,

Section 1. "The executive Power shall be vested in a President of the United States of America * * *.

Section 2. "The President shall be Commander in Chief of the Army and Navy of the United States, * * *.

"He shall have the Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; * * *.

Section 3. "He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; * * * he shall take Care that the Laws be faithfully executed, * * *.

Art. III,

Section 1. "The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."

The whole of the "executive Power" is vested in the President. Before entering office, the President swears that he

"will faithfully execute the Office of President of the United States, and will to the best of [his] Ability, preserve, protect and defend the Constitution of the United States." Art. II, Section 1.

This comprehensive grant of the executive power to a single person was bestowed soon after the country had thrown the yoke of monarchy. Only by instilling initiative and vigor in all of the three departments of Government, declared Madison, could tyranny in any form be avoided.[26] Hamilton added: "Energy in the Executive is a leading character in the definition of good government. It is essential to the protection of the community against foreign attack; it is not less essential to the steady administration of the laws; to the protection of property against those irregular and high-handed combinations which sometimes interrupt the ordinary course of justice; to the security of liberty against the enterprises and assaults of ambition, of faction, and of anarchy."[27] It is thus apparent that the Presidency was deliberately fashioned as an office of power and independence. Of course, the Framers created no autocrat capable of arrogating any power unto himself at any time. But neither did they create an automaton impotent to exercise the powers of Government at a time when the survival of the Republic itself may be at stake.

In passing upon the grave constitutional question presented in this case, we must never forget, as Chief Justice Marshall admonished, that the Constitution is "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs," and that "[i]ts means are adequate to its ends."[28] Cases do arise presenting questions which could not have been foreseen by the Framers. In such cases, the Constitution has been treated as a living document adaptable to new situations.[29] But we are not called upon today to expand the Constitution to meet a new situation. For, in this case, we need only look to history and time-honored principles of constitutional law—principles that have been applied consistently by all branches of the Government throughout our history. It is those who assert the invalidity of the Executive Order who seek to amend the Constitution in this case.

26. The Federalist, No. XLVIII.

27. The Federalist, No. LXX.

28. McCulloch v. Maryland, 4 Wheat. 316, 415, 424 (1819).

29. United States v. Classic, 313 U. S. 299, 315-316 (1941); Home Building & Loan Assn. v. Blaisdell, 290 U. S. 398, 442-443 (1934).

### III.

A review of executive action demonstrates that our Presidents have on many occasions exhibited the leadership contemplated by the Framers when they made the President Commander in Chief, and imposed upon him the trust to "take Care that the Laws be faithfully executed." With or without explicit statutory authorization, Presidents have at such times dealt with national emergencies by acting promptly and resolutely to enforce legislative programs, at least to save those programs until Congress could act. Congress and the courts have responded to such executive initiative with consistent approval.

Our first President displayed at once the leadership contemplated by the Framers When the national revenue laws were openly flouted in some sections of Pennsylvania, President Washington, without waiting for a call from the state government. summoned the militia and took decisive steps to secure the faithful execution of the laws.[30] ·When international disputes engendered by the French revolution threatened to involve this country in war, and while congressional policy remained uncertain, Washington issued his Proclamation of Neutrality. Hamilton, whose defense of the Proclamation has endured the test of time, invoked the argument that the Executive has the duty to do that which will preserve peace until Congress acts and, in addition, pointed to the need for keeping the Nation informed of the requirements of existing laws and treaties as part of the faithful execution of the laws.[31]

President John Adams issued a warrant for the arrest of Jonathan Robbins in order to execute the extradiction provisions of a treaty. This action was challenged in Congress on the ground that no specific statute prescribed the method to be used in executing the treaty. John Marshall, then a member of the House of Representatives, made the following argument in support of the President's action:

"The treaty, which is a law, enjoins the performance of a particular object. The person who is to perform this object is marked out by the Constitution, since the person is named who conducts the foreign intercourse, and is to take care that the laws be faithfully executed. The means by which it is to be performed, the force of the nation, are in the hands of this person. Ought not this person to perform the object, although the particular mode of using the means has not been prescribed? Congress, unquestionably may prescribe the mode. and Congress may devolve on others the whole execution of

---

30. 4 Annals of Congress 1411, 1413 (1794).
31. IV Works of Hamilton (Lodge ed. 1904) 432-444.

the contract; but, till this be done, it seems the duty of the Executive department to execute the contract by any means it possesses."[32]

Efforts in Congress to discredit the President for his action failed.[33] Almost a century later, this Court had occasion to give its express approval to "the masterly and conclusive argument of John Marshall."[34]

Jefferson's initiative in the Louisiana Purchase, the Monroe Doctrine, and Jackson's removal of Government deposits from the Bank of the United States further serve to demonstate by deed what the Framers described by word when they vested the whole of the executive power in the President.

Without declaration of war, President Lincoln took energetic action with the outbreak of the Civil War. He summoned troops and paid them out of the Treasury without appropriation therefor. He proclaimed a naval blockade of the Confederacy and seized ships violating that Blockade. Congress, far from denying the validity of these acts, gave them express approval. The most striking action of President Lincoln was the Emancipation Proclamation, issued in aid of the successful prosecution of the Civil War, but wholly without statutory authority.[35]

In an action furnishing a most apt precedent for this case, President Lincoln directed the seizure of rail and telegraph lines leading to Washington without statutory authority.[36] Many months later, Congress recognized and confirmed the power of the President to seize railroads and telegraph lines and provided criminal penalties for interference with Government operation.[37] This Act did not confer on the President any additional powers of seizure. Congress plainly rejected the view that the President's acts had been without legal sanction until ratified by the legislature. Sponsors of the bill declared that its purpose was only to confirm the power which the President already possessed.[38] Opponents insisted a statute

32. 10 Annals of Congress 596, 613-614 (1800); also printed in 5 Wheat. Ap. pp. 3, 27 (1820).

33. 10 Annals of Congress 619 (1800).

34. Fong Yue Ting v. United States, 149 U. S. 698, 714 (1893).

35. See The Prize Cases, 2 Black 635 (1863); Randall, Constitutional Problems Under Lincoln (1926); Corwin, The President: Office and Powers (1948 ed.), 277-281.

36. War on the Rebellion, Official Records of the Union and Confederate Armies, Series I, Vol. 11, pp. 603-604 (1880).

37. 12 Stat. 334 (1862).

38. Senator Wade, Cong. Globe, 37th Cong., 2d Sess. 509 (1862); Rep. Blair, id., at 548.

authorizing seizure was unnecessary and might even be construed as limiting existing Presidential powers.[39]

Other seizures of private property occurred during the Civil War, just as they had occurred during previous wars.[40] In United States v. Russell, 13 Wall. 623 (1872), three river steamers were seized by Army Quartermasters on the ground of "imperative military necessity." This Court affirmed an award of compensation, stating:

"Extraordinary and unforeseen occasions arise, however, beyond all doubt, in cases of extreme necessity in time of war or of immediate and impending public danger, in which private property may be impressed into the public service, or may be seized and appropriated to the public use, or may even be destroyed without the consent of the owner."

* * * *

"Exigencies of the kind do arise in time of war or impending public danger, but it is the emergency, as was said by a great magistrate, that gives the right, and it is clear that the emergency must be shown to exist before the taking can be justified. Such a justification may be shown, and when shown the rule is well settled that the officer taking private property for such a purpose, if the emergency is fully proved, is not a trespasser, and that the government is bound to make full compensation to the owner."[41]

In In re Neagle, 135 N. S. 1 (1890), this Court held that a federal officer had acted in line of duty when he was guarding a Justice of this Court riding circuit. It was conceded that there was no specific statute authorizing the President to assign such a guard. In holding that such a statute was not necessary, the Court broadly stated the question as follows:

"[The President] is enabled to fulfill the duty of the great department, expressed in the phrase that 'he shall take care that the laws be faithfully executed.'

---

39. Senators Browning, Fessenden, Cowan, Grimes, id., at 510, 512, 516, 520.

40. In 1818, the House Committee on Military Affairs recommended payment of compensation for vessels seized by the Army during the War of 1812. American State Papers, Claims (1834), 649. Mitchell v. Harmony, 13 How. 115, 134 (1852), involving seizure of a wagon train by an Army officer during the Mexican War, noted that such executive seizure was proper in case of emergency, but affirmed a personal judgment against the officer on the ground that no emergency had been found to exist. The judgment was paid by the United States pursuant to Act of Congress. 10 Stat. 727 (1852).

41. 13 Wall. at 627-628. Such a compensable taking was soon

"Is this duty limited to the enforcement of acts of Congress or of treaties of the United States according to their **express terms,** or does it include the rights, duties and obligations growing out of the Constitution itself, our international relations, and all the protection implied by the nature of the government under the Constitution?"[42]

The latter approach was emphatically adopted by the Court.

President Hayes authorized the wide-spread use of federal troops during the Railroad Strike of 1877.[43] President Cleveland also used the troops in the Pullman Strike of 1895 and his action is of special significance. No statute authorized this action. No call for help had issued from the Governor of Illinois; indeed Governor Altgeld disclaimed the need for supplemental forces. But the President's concern was that federal laws relating to the free flow of interstate commerce and the mails be continuously and faithfully executed without interruption.[44] To further this aim his agents sought and obtained the injunction upheld by this Court in In re Debs, 158 U. S. 564 (1895). The Court scrutinized each of the steps taken by the President to insure execution of the "mass of legislation" dealing with commerce and the mails and gave his conduct full approval. Congress likewise took note of this use of Presidential power to forestall apparent obstacles to the faithful execution of the laws. By separate resolution, both the Senate and the House Commended the Executive's action.[45]

President Theodore Roosevelt seriously contemplated seizure of Pennsylvania coal mines if a coal shortage necessitated such action.[46] In his autobiography, President Roosevelt expounded the "Stewardship Theory" of Presidential power, stating that "the executive as subject only to the people, and, under the Constitution, bound to serve the people affirmatively in cases where the Constitution does not explicity forbid him to render the service."[47] Because the contemplated seizure of the coal

distinguished from the noncompensable taking and distribution of property during the extreme exigencies of a military campaign. United States v. Pacific R. Co., 120 U. S. 227 (1887).

42. 135 U. S. at 64.

43. Rich. The President and Civil Disorders (1941), 72-86.

44. Cleveland, The Government in the Chicago Strike of 1894 (1913).

45. 26 Cong. Rec. 7281-7284, 7544-7546 (1894).

46. Theodore Roosevelt, Autobiography (1916 ed.), 479-491.

47. Id., at 378.

mines was based on this theory, then ex-President Taft criticized President Roosevelt in a passage in his book relied upon by the District Court in this case. Taft, Our Chief Magistrate and His Powers (1915), 139-147. In the same book, however, President Taft agreed that such powers of the President as the duty "to take care that the laws be faithfully executed" could not be confined to "express Congressional statutes." In re Neagle, supra, and In re Debs, supra, were cited as conforming with Taft's concept of the office, id., at pp. 88-94, as they were later to be cited with approval in his opinion as Chief Justice in Myers v. United States, 272 U. S. 52, 133 (1926).[18]

In 1909, President Taft was informed that Government owned oil lands were being patented by private parties at such a rate that public oil lands would be depleted in a matter of months. Although Congress had explicitly provided that these lands were open to purchase by United States citizens, 29 Stat. 526 (1897), the President nevertheless ordered the lands withdrawn from sale "[i]n aid of proposed legislation." In United States v. Midwest Oil Co., 236 U. S. 459 (1915), the president's action was sustained as consistent with executive practice throughout our history. An excellent brief was filed in the case by the Solicitor General, Mr. John W. Davis, together with Assistant Attorney General Knaebel, later Reporter for this Court. In this brief, the situation confronting President Taft was described as "an emergency; there was no time to wait for the action of Congress." The brief then discusses the powers of the President under the Constitution in such a case:

"Ours is a self-sufficient Government within its sphere. (Ex parte Siebold, 100 U. S., 371, 395; In re Debs, 158 U. S. 564, 578). 'Its means are adequate to its ends' (McCulloch v. Maryland, 4 Wheat., 316, 424), and it is rational to assume that its active forces will be found equal in most things to the emergencies that confront it. While perfect flexibility is not to be expected in a Government of divided powers, and while division of power is one of the principal features of the Constitution, it is the plain duty of those who are called upon to draw the dividing lines to ascertain the essential, recognize the practical, and avoid a slavish formalism which can only serve to ossify the Government and reduce its effi-

18. Humphrey's Executor v. United States, 295 U. S. 602, 626 (1935), disapproved expressions in the Myers opinion only to the extent that they related to the President's power to remove members of quasi-legislative and judicial commissions as contrasted with executive employees.

ciency without any compensating good. The function of making laws is peculiar to Congress, and the Executive can not exercise that function to any degree. But this is not to say that all of the **subjects** concerning which laws might be made are perforce removed from the possibility of Executive influence. The Executive may act upon things and upon men in many relations which have not, though they might have, been actually regulated by Congress. In other words, just as there are fields which are peculiar to Congress and fields which are peculiar to the Executive, so there are fields which are common to both, in the sense that the Executive may move within them until they shall have been occupied by legislative action. These are not the fields of legislative prerogative, but fields within which the lawmaking power may enter and dominte whenever it chooses. This situation results from the fact that the President is the active agent, not of Congress, but of the Nation. As such he performs the duties which the Constitution lays upon him immediately, and as such, also, he executes the laws and regulations adopted by Congress. He is the agent of the people of the United States, deriving all his powers from them and responsible directly to them. In no sense is he the agent of Congress. He obeys and executes the laws of Congress, not because Congress is enthroned in authority over him, but because the Constitution directs him to do so.

"Therefore it follows that in ways short of making laws or disobeying them, the Executive may be under a grave constitutional duty to act for the national protection in situations not covered by the acts of Congress, and in which, even, it may not be said that his action is the direct expression of any particular one of the independent powers which are granted to him specifically by the Constitution. Instances wherein the President has felt and fulfilled such a duty have not been rare in our history, though, being for the public benefit and approved by all, his acts have seldom been challenged in the courts. We are able, however, to present a number of apposite cases which were subjected to judicial inquiry."

The brief then quotes from such cases as In re Debs, supra, and In re Neagle, supra, and continues:

"As we understand the doctrine of the Neagle case, and the cases therein cited, it is clearly this: The Executive is authorized to exert **the power of the United States** when he finds this necessary for the protection of the agencies, the instrumentalities, or the property of the Government. This does not mean an authority to disregard the wishes of Congress on the subject, when that subject lies within its con-

trol and when those wishes have been expressed, and it certainly does not involve the slightest semblance of a power to legislate, much less to 'suspend' legislation already passed by Congress. It involves the performance of specific acts, not of a legislative but purely of an executive character—acts which are not in themselves laws, but which presuppose a 'law' authorizing him to perform them. This law is not expressed, either in the Constitution or in the enactments of Congress, but reason and necessity compel that it be implied from the exigencies of the situation.

"In none of the cases which we have mentioned, nor in the cases cited in the extracts taken from the Neagle case, was it possible to say that the action of the President was directed, expressly or impliedly, by Congress. The situations dealt with had never been covered by any act of Congress, and there was no ground whatever for a contention that the possibility of their occurrence had ever been specifically considered by the legislative mind. In none of those cases did the action of the President amount merely to the execution of some specific law.

"Neither does any of them stand apart in principle from the case at bar, as involving the exercise of specific constitutional powers of the President in a degree in which this case does not involve them. Taken collectively, the provisions of the Constitution which designate the President as the official who must represent us in foreign relations, in commanding the Army and Navy, in keeping Congress informed of the state of the Union, in insuring the faithful execution of the laws and in recommending new ones, considered in connection with the sweeping declaration that the executive power shall be vested in him, completely demonstrate that his is the watchful eye, the active hand, the overseeing dynamic force of the United States."[49]

This brief is valuable not alone because of the caliber of its authors but because it lays bare in succinct reasoning the basis of the executive practice which this Court approved in the Midwest Oil case.

During World War I, President Wilson established a War Labor Board without awaiting specific direction by Congress.[50] With William Howard Taft and Frank P. Walsh as co-chairmen, the Board had as its purpose the prevention of strikes and lockouts interfering with the production of goods needed

49. Brief for the United States, No. 278, October Term, 1914, pp. 11, 75-77, 88-90.

50. National War Labor Board. Bureau of Labor Statistics, Bull. 287 (1921).

to meet the emergency. Effectiveness of War Labor Board decision was accomplished by Presidential action, including seizure of industrial plants.[51] Seizure of the Nation's railroads was also ordered by President Wilson.[52]

Beginning with the Bank Holiday Proclamation[53] and continuing through World War II, executive leadership and initiative were characteristic of President Franklin D. Roosevelt's administration. In 1939, upon the outbreak of war in Europe, the President proclaimed a limited national emergency for the purpose of strengthening national defense.[54] By May of 1941, the danger from the Axis belligerents having become clear, the President proclaimed "an unlimited national emergency" calling for mobilization of the Nation's defenses to repel aggression.[55] The President took the initiative in strengthening our defenses by acquiring rights from the British Government to establish air bases in exchange for overage destroyers.[56]

In 1941, President Roosevelt acted to protect Iceland from attack by Axis powers when British forces were withdrawn

---

51. Id., at 24-25, 32-34. See also, 2 Official U. S. Bull. (1918) No. 412; 8 Baker, Woodrow Wilson, Life & Letters (1939), 400-402; Berman, Labor Disputes and the President (1924), 125-153; Pringle, The Life and Times of William Howard Taft (1930), 915-925.

52. 39 Stat. 619, 645 (1916), provides that the President may take possession of any system of transportation in time of war. Following seizure of the railroads by President Wilson, Congress enacted detailed legislation regulating the mode of federal control. 40 Stat. 451 (1918).

When Congress was considering the statute authorizing the President to seize communications systems whenever he deemed such action necessary during the war, 40 Stat. (1918), Senator (later President) Harding opposed on the ground that there was no need for such stand-by powers because, in event of present necessity, the Chief Executive "ought to" seize communications lines, "else he would be unfaithful to his duties as such Chief Executive." 56 Cong. Rec. 9064 (1918).

53. 48 Stat. 1869 (1933).

54. 54 Stat. 2643 (1939).

55. Stat. 1647 (1941).

56. Cong. Rec. 11354 (1940) (Message of the President). Sec. 39 Ops. Atty. Genl. 484 (1940). Attorney General Jackson's opinion did not extend to the transfer of "Mosquito boats" solely because an express statutory prohibition on transfer was applicable.

by sending our forces to occupy Iceland. Congress was informed of this action on the same day that our forces reached Iceland.[57] The occupation of Iceland was but one of "at least 125 incidents" in our history in which Presidents, "without Congressional authorization, and in the absence of a declaration of war, [have] ordered the Armed Forces to take action or maintain positions abroad."[58]

Some six months before Pearl Harbor, a dispute at a single aviation plant at Inglewood, California, interrupted a segment of the production of military aircraft. In spite of the comparative insignificance of this work stoppage to total defense production as contrasted with the complete paralysis now threatened by a shutdown of the entire basic steel industry, and even though our armed forces were not then engaged in combat, President Roosevelt ordered the seizure of the plant "pursuant to the powers vested in [him] by the Constitution and laws of the United States, as President of the United States of America and Commander in Chief of the Army and Navy of the United States."[59] The Attorney General (Jackson) vigorously proclaimed that the President had the moral duty to keep this Nation's defense effort a "going concern." His ringing moral justification was coupled with a legal justification equally well stated:

"The Presidential proclamation rests upon the aggregate of the Presidential powers derived from the Constitution itself and from statutes enacted by the Congress.

"The Constitution lays upon the President the duty 'to' take care that the laws be faithfully executed.' Among the laws which he is required to find means to execute are those which direct him to equip an enlarged army, to provide for a strengthened navy, to protect Government property, to protect those who are engaged in carrying out the business of the Government, and to carry out the provisions of the Lend-Lease Act. For the faithful execution of such laws the President has back of him not only each general law-enforcement power conferred by the various acts of Congress but the aggregate of all such laws plus that wide discretion as to method vested in him by the Constitution for the purpose of executing the laws.

---

57. 87 Cong. Rec. 5868 (1941) (Message of the President).

58. Powers of the President to Send the Armed Forces Outside the United States, Report prepared by executive department for use of joint committee of Senate Committeees on Foreign Relations and Armed Services, 82d Cong., 1st Sess., Committee Print 2 (1951).

59. Exec. Order 8773, 6 Fed. Reg. 2777 (1941).

494

"The Constitution also places on the President the responsibility and vests in him the powers of Commander in Chief of the Army and of the Navy. These weapons for the protection of the continued existence of the Nation are placed in his sole command and the implication is clear that he should not allow them to become paralyzed by failure to obtain supplies for which Congress has appropriated the money and which it has directed the President to obtain."[60]

At this time, Senator Connally proposed amending the Selective Service and Training Act to authorize the President to seize any plant where an interruption of production would unduly impede the defense effort.[61] Proponents of the measure in no way implied that the legislation would add to the powers already possessed by the President[62] and the amendment was opposed as unnecessary since the President already had the power.[63] The amendment relating to plant seizures was not approved at that session of Congress.[64]

Meanwhile, and also prior to Pearl Harbor, the President ordered the seizure of a shipbuilding company and an aircraft parts plant.[65] Following the declaration of war, but prior to the Smith-Connally Act of 1943, five additional industrial concerns were seized to avert interruption of needed production.[66] During the same period, the President directed seizure of the Nation's coal mines to remove an obstruction to the effective prosecution of the war.[67]

---

60. See 89 Cong. Rec. 3992 (1943). The Attorney General also noted that the dispute at North American Aviation was Communist inspired and more nearly resembled an insurrection than a labor strike. The relative size of North American Aviation and the impact of an interruption in production upon our defense effort were not described.

61. 87 Cong. Rec. 4932 (1941). See also S. 1600 and S. 2054, 77th Cong., 1st Sess. (1941).

62. Reps. May, Whittington; 87 Cong. Rec. 5895, 5972 (1941).

63. Repsc. Dworshak, Feddis, Harter, Dirksen, Hook; 87 Cong. Rec. 5901-5910, 5974 (1941).

64. The plant seizure amendment passed the Senate, but was rejected in the House after a Conference Committee adopted the amendment. 87 Cong. Rec. 6424 (1941).

65. Exec. Order 8868, 6 Fed. Reg. 4349 (1941); Exec. Order 8328, 6 Fed. Reg. 5559 (1941).

66. Exec. Order 9141, 7 Fed. 2961 (1942); Exec. Order 9220, 7 Fed. Reg. 6413 (1942); Exec. Order 9225, 7 Fed. Reg. 6627 (1942); Exec. Order 9254, 7 Fed. Reg. 8333 (1942); Exec. Order 9351, 8 Fed. Reg. 8097 (1943).

67. Exec. Order 9340, 8 Fed. 5695 (1943).

The procedures adopted by President Roosevelt closely resembled the methods employed by President Wilson. A National War Labor Board, like its predecessor of World War I. was created by Executive Order to deal effectively and fairly with disputes affecting defense production.[68] Seizures were considered necessary upon disobedience of War Labor Board orders, to assure that the mobilization effort remained a "going concern," and to enforce the economic stabilization program.

At the time of the seizure of the coal mines, Senator Connally's bill to provide a statutory basis for seizures and for the War Labor Board was again before Congress. As stated by its sponsor, the purpose of the bill was not to augment Presidential powers, but to "let the country know that the Congress is squarely behind the President."[69] As in the case of the legislative recognition of President Lincoln's power to seize, Congress again recognized that the President already had the necessary power, for there was no intention to "ratify" past actions of doubtful validity. Indeed, when Senator Tydings offered an amendment to the Connally bill expressly to confirm and validate the seizure of the coal mines, sponsors of the bill opposed the amendment as casting doubt on the legality of the seizure and the amendment was defeated.[70] When the Connally bill, S. 796, came before the House, all parts after the enacting clause were stricken and a bill introduced by Representative Smith of Virginia was substituted and passed. This action in the House is significant because the Smith bill did not contain the provisions authorizing seizure by the President but did contain provisions controlling and regulating activities in respect to properties seized by the Government under statute "or otherwise."[71] After a conference, the seizure provisions of the Connally bill, enacted as the Smith-Connally or War Labor Disputes Act of 1943, 57 Stat. 163, were agreed to by the House.

Following passage of the Smith-Connally Act, seizures to assure continued production on the basis of terms recommended by the War Labor Board were based upon that Act as well as upon the President's power under the Constitution and the laws generally. A question did arise as to whether

68. Exec. Order 9017, 7 Fed. Reg. 237 (1942); 1 Termination Report of the National War Labor Board 5-11.

69. 89 Cong. Rec. 3807 (1943). Similar views of the President's existing power were expressed by Senators Lucas, Wheeler, Austin and Barkley. Id., at 3885-3887, 3896, 3992.

70. 89 Cong. Rec. 3989-3992 (1943).

71. S. 796, 78th Cong., 1st Sess., §12, 13 (1943), as passed by the House.

the statutory language relating to "any plant, mine, or facility equipped for the manufacture, production, or mining of any articles or materials"[72] authorized the seizure of properties of Montgomery Ward & Co., a retail department store and mail order concern. The Attorney General (Biddle) issued an opinion that the President possessed the power to seize Montgomery Ward properties to prevent a work stoppage whether or not the terms of the Smith-Connally Act authorized such a seizure.[73] This opinion was in line with the views on Presidential powers maintained by the Attorney General's predecessors (Murphy[74] and Jackson[75]) and his successor (Clark[76]). Accordingly, the President ordered seizure of the Chicago properties of Montgomery Ward in April, 1944, when that company refused to obey a War Labor Board order concerning the bargaining representative of its employees in Chicago.[77] In Congress, a Select Committee to Investigate Seizure of the Property of Montgomery Ward & Co., assuming that the terms of the Smith-Connally Act did not cover this seizure, concluded that the seizure "was not only within the Constitutional power but was the plain duty of the President."[78] Thereafter, an election determined the bargaining representative for the Chicago employees and the properties were returned to Montgomery Ward & Co. In December, 1944, after continued defiance of a series of War Labor Board orders, President Roosevelt ordered the seizure of Montgomery Ward properties throughout the country.[79] The Court of Appeals for the Seventh Circuit upheld this seizure on statutory grounds and also indicated its disapproval of a lower court's denial of seizure power apart from express statute.[80]

---

72. 57 Stat. 163, 164 (1943).

73. 40 Ops. Atty. Gen. 312 (1944). See also Hearings before House Select Committee to Investigate Seizure of Montgomery Ward & Co., 78th Cong., 2d Sess. 117-132 (1944).

74. 39 Ops. Atty. Genl. 343, 347 (1939).

75. Note 60, supra.

76. Letter introduced in Hearings before Senate Committee on Labor and Public Welfare on S. 249, 81st Cong., 1st Sess. 232 (1949) pointing to the "exceedingly great" powers of the President to deal with emergencies even before the Korean crisis.

77. Exc. Order 9438, 9 Fed. Reg. 4459 (1944).

78. H. R. Rep. No. 1904, 78th Cong., 2d Sess. 25 (1944) (the Committee divided along party lines).

79. Exec. Order 9508, 9 Fed. Reg. 15079 (1944).

80. United States v. Montgomery Ward & Co., 150 F. 2d 369 (C. A. 7th Cir. 1945), reversing 58 Supp. 408 (N. D. Ill. 1945).

More recently, President Truman acted to repel aggression by employing our armed forces in Korea.[81] Upon the intervention of the Chinese Communists, the President proclaimed the existence of an unlimited national emergency requiring the speedy build-up of our defense establishment.[82] Congress responded by providing for increased manpower and weapons for our own armed forces, by increasing military aid under the Mutual Security Program and by enacting economic stabilization measures, as previously described.

. This is but a cursory summary of executive leadership. But it amply demonstrates that Presidents have taken prompt action to enforce the laws and protect the country whether or not Congress happened to provide in advance for the particular method of execution. At the minimum, the executive actions reviewed here in sustain the action of the President in this case. And many of the cited examples of Presidential practice go far beyond the extent of power necessary to sustain the President's order to seize the steel mills. The fact that temporary executive seizures of industrial plants to meet an emergency have not been directly tested in this Court furnishes not the slightest suggestion that such actions have been illegal. Rather, the fact that Congress and the courts have consistently recognized and given their support to such executive action indicates that such a power of seizure has been accepted throughout our history.

History bears out the genius of the Founding Fathers, who created a Government subject to law but not left subject to inertia when vigor and initiative are required.

## IV.

Focusing now on the situation confronting the President on the night of April 8, 1952, we cannot but conclude that the President was performing his duty under the Constitution "to take care that the laws be faithfully executed"—a duty described by President Benjamin Harrison as "the central idea of the office."[83]

The President reported to Congress the morning after the seizure that he acted because a work stoppage in steel production would immediately imperil the safety of the Nation

---

See also Ken-Rad Tube & Lamp Corp. v. Badeau, 55 F. Supp. 193, 197-199 (W. D. Ky. 1944), where the court held that a seizure was proper with or without express statutory authorization.

81. United States Policy in the Korean Crisis (1950), Dept. of State Pub. 3922.

82. 15 Fed. Reg. 9029 (1950).

83. Harrison, This Country of Ours (1897), 98.

by preventing execution of the legislative programs for procurement of military equipment. And, while a shut down could be averted by granting the price concessions requested by plaintiffs, granting such concessions would disrupt the price stabilization program also enacted by Congress. Rather than fail to execute either legislative program, the President acted to execute both.

Much of the argument in this case has been directed at straw men. We do not now have before us the case of a President acting solely on the basis of his own notions of the public welfare. Nor is there any question of unlimited executive power in this case. The President himself closed the door to any such claim when he sent his Message to Congress stating his purpose to abide by any action of Congress, whether approving or disapproving his seizure action. Here, the President immediately made sure that Congress was fully informed of the temporary action he had taken only to preserve the legislative programs from destruction until Congress could act.

The absence of a specific statute authorizing seizure of the steel mills as a mode of executing the laws—both the military procurement program and the anti-inflation program—has not until today been thought to prevent the President from executing the laws. Unlike an administrative commission confined to the enforcement of the statute under which it was created, or the head of a department when administering a particular statute, the President is a constitutional officer charged with taking care that a "mass of legislation" be executed. Flexibility as to mode of execution to meet critical situations is a matter of practical necessity. This practical construction of the "Take Care" clause, advocated by John Marshall, was adopted by this Court in In re Neagle, In re Debs and other cases cited supra. See also Ex parte Quirin, 317 U. S. 1, 26 (1942). Although more restrictive views of executive power, advocated in dissenting opinions of Justice Holmes, McReynolds and Brandeis, were emphatically rejected by this Court in Myers v. United States, supra, members of today's majority treat these dissenting views as authoritative.

There is no statute prohibiting seizure as a method of enforcing legislative programs. Congress has in no wise indicated that its legislation is not to be executed by the taking of private property (subject of course to the payment of just compensation) if its legislation cannot otherwise be executed. Indeed, the Universal Military Training and Service Act authorizes the seizure of any plant that fails to fill a govern-

ment contract[84] or the properties of any steel producer that fails to allocate steel as directed for defense production.[85] And the Defense Production Act authorizes the President to requisition equipment and condemn real property needed without delay in the defense effort.[86] Where Congress authorizes seizure in instances not necessarily crucial to the defense program, it can hardly be said to have disclosed an intention to prohibit seizures where essential to the execution of that legislative program.

Whatever the extent of Presidential power on more tranquil occasions, and whatever the right of the President to execute legislative programs as he sees fit without reporting the mode of execution to Congress, the single Presidential purpose disclosed on this record is to faithfully execute the laws by acting in an emergency to maintain the status quo, thereby preventing collapse of the legislative programs until Congress could act. The President's action served the same purposes as a judicial stay entered to maintain the status quo in order to preserve the jurisdiction of a court. In his Message to Congress immediately following the seizure, the President explained the necessity of his action in executing the military procurement and anti-inflation legislative programs and expressed his desire to cooperate with any legislative proposals approving, regulating or rejecting the seizure of the steel mills. Consequently, there is no evidence whatever of any Presidential purpose to defy Congress or act in any way inconsistent with the legislative will.

In United States v. Midwest Oil Co., supra, this Court approved executive action where, as here, the President acted to preserve an important matter until Congress could act— even though his action in that case was contrary to an express statute. In this case, there is no statute prohibiting the action taken by the President in a matter not merely important but threatening the very safety of the Nation. Executive inaction in such a situation, courting national disaster, is foreign to the concept of energy and initiative in the executive as created by the Founding Fathers. The Constitution was itself "adopted in a period of grave emergency * * *. While emergency does not create power, emergency may furnish the occasion for the exercise of power."[87] The Framers

---

84. 62 Stat. 604, 626 (1948), 50 U. S. C. App (Supp. IV) §468(c).

85. 62 Stat. 604, 627 (1948), 50 U. S. C. App. (Supp. IV) §468 (h) (1).

86. Tit. II. 64 Stat. 798 (1950), as amended 65 Stat. 138 (1951).

87. Home Building & Loan Assn. v. Blaisdell, 290 U. S. 398, 425-526 (1934).

knew, as we should know in these times of peril, that there is real danger in Executive weakness. There is no cause to fear Executive tyranny so long as the laws of Congress are being faithfully executed. Certainly there is no basis for fear of dictatorship when the Executive acts, as he did in this case, only to save the situation until Congress could act.

V.

Plaintiffs place their primary emphasis on the Labor Management Relations Act of 1947, hereinafter referred to as the Taft-Hartley Act, but do not contend that that Act contains any provisions prohibiting seizure.

Under the Taft-Hartley Act, as under the Wagner Act, collective bargaining and the right to strike are at the heart of our national labor policy. Taft-Hartley preserves the right to strike in an emergency, however serious, subject only to an 80-day delay in cases of strikes imperiling the national health and safety.[88] In such a case, the President may appoint a board of inquiry to report the facts of the labor dispute. Upon receiving that report, the President may direct the Attorney General to petition a District Court to enjoin the strike. If the injunction is granted, it may continue in effect for no more than 80 days, during which time the board of inquiry makes further report and efforts are made to settle the dispute. When the injunction is dissolved, the President is directed to submit a report to Congress together with his recommendations.[89]

Enacted after World War II, Taft-Hartley restricts the right to strike against private employers only to a limited extent and for the sole purpose of affording an additional period of time within which to settle the dispute. Taft-Hartley in no way curbs strikes before an injunction can be obtained and after an 80-day injunction is dissolved.

Plaintiffs admit that the emergency procedures of Taft-Hartley are not mandatory. Nevertheless, plaintiffs apparently argue that, since Congress did provide the 80-day injunction method for dealing with emergency strikes, the President cannot claim that an emergency exists until the procedures of Taft-Hartley have been exhausted. This argument was not the basis of the District Court's opinion and, whatever merit the argument might have had following the enactment of Taft-Hartley, it loses all force when viewed in light of the statutory pattern confronting the President in this case.

---

88. See Bus. Employees v. Wisconsin Board, 340 U. S. 383 (1951).

89. §§206-210, Labor Management Relations Act of 1947. 29 U. S. C. (Supp. IV) §§176-180.

In Title V of the Defense Production Act of 1950,[90] Congress stated:

"It is the intent of Congress, in order to provide for effective price and wage stabilization pursuant to title IV of this Act and to maintain uninterrupted production, that there be effective procedures for the settlement of labor disputes affecting national defense." (§501.)

Title V authorized the President to initiate labor-management conferences and to take action appropriate to carrying out the recommendations of such conferences and the provisions of Title V. (§502.) Due regard is to be given to collective bargaining practice and stabilization policies and no action taken is to be inconsistent with Taft-Hartley and other laws. (§503.) The purpose of these provisions was to authorize the President "to establish a board, commission or other agency, similar to the War Labor Board of World War II, to carry out the title."[91]

The President authorized the Wage Stabilization Board (WSB), which administers the wage stabilization functions of Title IV of the Defense Production Act, also to deal with labor disputes affecting the defense program.[92] When extension of the Defense Production Act was before Congress in 1951, the Chairman of the Wage Stabilization Board described in detail the relationship between the Taft-Hartley procedures applicable to labor disputes imperiling the national health and safety and the new WSB dispute procedures especially devised for settlement of labor disputes growing out of the needs of the defense program.[93] Aware that a technique separate from Taft-Hartley had been devised, members of Congress attempted to divest the WSB of its dispute powers. These attempts were defeated in the House, were not brought to a vote in the Senate and the Defense Production Act was extended through June 30, 1952, without change in the disputes powers of the WSB.[94] Certainly this legislative creation

90. 64 Stat. 132 (1950).

91. H. R. Rep. No. 3042, 81st Cong., 2d Sess. 35 (1950) (Conference Report). See also S. Rep. No. 2250, 81st Cong. 2d Sess. 41 (1950).

92. Exec. Order 10161, 15 Fed. Reg. 6105 (1950), as amended, Exec. Order 10233, 16 Fed. Reg. 3503 (1951).

93. Hearings before the House Committee on Banking and Currency on Defense Production Act Amendments of 1951, 82d Cong., 1st Sess. 305-306, 312-313 (1951).

94. The Lucas Amendment to abolish the disputes function of the WSB was debated at length in the House, the sponsor of the amendment pointing out the similarity of the WSB functions to

of a new procedure for dealing with defense disputes negatives any notion that Congress intended the earlier and discretionary Taft-Hartley procedure to be an exclusive procedure.

Accordingly, as of December 22, 1951, the President had a choice between alternate procedures for settling the threatened strike in the steel mills: one route created to deal with peacetime disputes; the other route specially created to deal with disputes growing out of the defense and stabilization program. There is no question of by-passing a statutory procedure because both of the routes available to the President in December were based upon statutory authorization. Both routes were available in the steel dispute. The Union, by refusing to abide by the defense and stabilization program, could have forced the President to invoke Taft-Hartley at that time to delay the strike a maximum of 80 days. Instead, the Union agreed to cooperate with the defense program and submit the dispute to the Wage Stabilization Board.

Plaintiffs had no objection whatever at that time to the President's choice of the WSB route. As a result, the strike was postponed, a WSB panel held hearings and reported the position of the parties and the WSB recommended the terms of a settlement which it found were fair and equitable. Moreover, the WSB performed a function which the board of inquiry contemplated by Taft-Hartley could not have accomplished when it checked the recommended wage settlement against its own wage stabilization regulations issued pursuant to its stabilization functions under Title IV of the Defense Production Act. Thereafter, the parties bargained on the basis of the WSB recommendation.

When the President acted on April 8, he had exhausted the procedures for settlement available to him. Taft-Hartley was a route parallel to, not connected with, the WSB procedure. The strike had been delayed 99 days as contrasted with the maximum delay of 80 days under Taft-Hartley. There had been a hearing on the issues in dispute and bargaining which promised settlement up to the very hour before seizure had broken down. Faced with immediate national peril

---

those of the War Labor Board and noting the seizures that occurred when War Labor Board orders were not obeyed. Cong. Rec., July 18, 1951, pp. 8580-8606. The amendment was rejected by a vote of 217 to 113. Id., at 8606. A similar amendment introduced in the Senate was withdrawn. Cong. Rec., June 28, 1951, pp. 7592-7593. The Defense Production Act was extended without amending Tit. V or otherwise affecting the disputes functions of the WSB. 65 Stat. 132 (1951).

through stoppage in steel production on the one hand and faced with destruction of the wage and price legislative programs on the other, the President took temporary possession of the steel mills as the only course open to him consistent with his duty to take care that the laws be faithfully executed.

Plaintiffs' property was taken and placed in the possession of the Secretary of Commerce to prevent any interruption in steel production. It made no difference whether the stoppage was caused by a union-management dispute over terms and conditions of employment, a union-Government dispute over wage stabilization or a management-Government dispute over price stabilization. The President's action has thus far been effective, not in settling the dispute, but in saving the various legislative programs at stake from destruction until Congress could act in the matter.

## VI.

The diversity of views expressed in the six opinions of the majority, the lack of reference to authoritative precedent, the repeated reliance upon prior dissenting opinions, the complete disregard of the uncontroverted facts showing the gravity of the emergency and the temporary nature of the taking all serve to demonstrate how far afield one must go to affirm the order of the District Court.

The broad executive power granted by Article II to an officer on duty 365 days a year cannot, it is said, be invoked to avert disaster. Instead, the President must confine himself to sending a message to Congress recommending action. Under this messenger-boy concept of the Office, the President cannot even act to preserve legislative programs from destruction so that Congress will have something left to act upon. There is no judicial finding that the executive action was unwarranted because there was in fact no basis for the President's finding of the existence of an emergency[95] for, under this view, the gravity of the emergency and the immediacy of the threatened disaster are considered irrelevant as a matter of law.

Seizure of plaintiffs' property is not a pleasant undertaking. Similarly unpleasant to a free country are the draft which disrupts the home and military procurement which causes economic dislocation and compels adoption of price controls, wage stabilization and allocation of materials. The President informed Congress that even a temporary Government operation of plaintiffs' properties was "thoroughly distasteful" to him, but was necessary to prevent immediate paralysis of

95. Compare Sterling v. Constantin, 287 U. S. 378, 399-401 (1932).

the mobilization program. Presidents have been in the past, and any man worthy of the Office should be in the future, free to take at least interim action necessary to execute legislative programs essential to survival of the Nation. A sturdy judiciary should not be swayed by the unpleasantness or unpopularity of necessary executive action, but must independently determine for itself whether the President was acting, as required by the Constitution, "to take Care that the Laws be faithfully executed."

As the District Judge stated, this is no time for "timorous" judicial action. But neither is this a time for timorous executive action. Faced with the duty of executing the defense programs which Congress had enacted and the disastrous effects that any stoppage in steel production would have on those programs, the President acted to preserve those programs by seizing the steel mills. There is no question that the possession *was other than temporary in character and subject to congressional direction—either approving, disapproving or regulating the manner in which the mills were to be administered and returned to the owners. The President immediately informed Congress of his action and clearly stated his intention to abide by the legislative will. No basis for claims or arbitrary action, unlimited powers or dictatorial usurpation of congressional power appears from the facts of this case. On the contrary, judicial, legislative and executive precedents throughout our history demonstrate that in this case the President acted in full conformity with his duties under the Constitution. Accordingly, we would reverse the order of the District Court.